IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Donald Gene Kerr, | ) | C/A No.: 1:15-29-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Bruce Howe Hendricks, United States District Judge, dated January 8, 2015, referring this matter for disposition. [ECF No. 8]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 7].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claims for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

 A.    Procedural History

 On May 13, 2011, Plaintiff filed applications for DIB and SSI in which he alleged his disability began on October 18, 2008. Tr. at 94, 96, 200–06, 207–12. His applications were denied initially and upon reconsideration. Tr. at 135–40, 143–45, 146–48. On September 12, 2013, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Peggy McFadden-Elmore. Tr. at 39–78 (Hr'g Tr.). The ALJ issued an unfavorable decision on November 22, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 9–26. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on January 5, 2015. [ECF No. 1].

 B.    Plaintiff's Background and Medical History

  1.    Background

 Plaintiff was 47 years old at the time of the hearing. Tr. at 44. He completed the tenth grade. Tr. at 46. He alleges he has been unable to work since October 18, 2008. Tr. at 44.

  2.    Medical History

 Plaintiff underwent anterior cervical diskectomy and fusion on December 3, 2001. Tr. at 356. He was out of work in 2002, but returned to work around February 2003. Tr. at 337–45.

On June 14, 2007, Plaintiff underwent left L4-5 diskectomy and lateral fusion with bone grafting. Tr. at 352. Randall G. Drye, M.D. ("Dr. Drye"), released him to return to work without restrictions on September 5, 2007. Tr. at 364.

On May 25, 2010, Plaintiff presented to Lexington Family Practice for left shoulder pain and anxiety. Tr. at 291. The provider noted that Plaintiff had not followed up in three years because he had lost his job and insurance and was unable to afford medical care. *Id.* Plaintiff also reported recurrent back pain and was noted to have undergone full disc surgery in 2007. *Id.* Plaintiff's left shoulder was tender to palpation at the subacromial bursa. He complained of pain with abduction at 60 degrees and tenderness with internal rotation against resistance. *Id.* The provider diagnosed anxiety, depression and left shoulder subacromial bursitis. *Id.* He prescribed Meloxicam and Darvocet for pain relief and Citalopram for depression. *Id.*

On August 23, 2010, Plaintiff presented to Michael Harris, M.D. ("Dr. Harris"), at Lexington Family Practice. Tr. at 302. Dr. Harris noted that Plaintiff was doing okay, but had a little anxiety and occasional paranoia. *Id.* He wrote that Plaintiff was trying to find a job, but was applying for disability because of his back surgeries. *Id.* He assessed depression and mild anxiety and instructed Plaintiff to continue his current medications. *Id.*

At the request of the state agency, Dr. Harris completed a form in which he indicated Plaintiff was diagnosed with depression and prescribed Citalopram. Tr. at 294. He suggested medication had helped Plaintiff's condition and stated psychiatric care had not been recommended. *Id.* He indicated Plaintiff was oriented to all spheres; had a

racing thought process; had paranoid thought content; had a worried/anxious mood/affect; had adequate attention/concentration; and had poor memory. *Id.* Dr. Harris described Plaintiff's work-related limitation of function due to a mental condition as "slight" and endorsed Plaintiff's ability to manage his own funds. *Id.*

On October 7, 2010, orthopedist Thomas Motycka, M.D. ("Dr. Motycka"), examined Plaintiff at the request of the state agency. Tr. at 297–99. Plaintiff had normal range of motion ("ROM"), negative straight-leg raising test, and was able to heel-walk, toe-walk, tandem-walk, and squat. Tr. at 299. Plaintiff demonstrated no muscle weakness, abnormal reflexes, gait disturbance, reduced strength, sensory loss, atrophy, or joint abnormalities. *Id.* Dr. Motycka assessed a history of cervical diskectomy, a history of lumbar diskectomy, a history of depression, and evidence of reactive airway disease secondary to Plaintiff's smoking history. *Id.*

On December 5, 2010, Plaintiff presented to C. Stewart Darby, Ph. D., PA-C. ("Dr. Darby"), with left shoulder pain and right hand numbness. Tr. at 311. Dr. Darby assessed hypertension, neck pain, and depression. Tr. at 312. He prescribed medications and indicated he would obtain Plaintiff's records from Lexington Family Practice. *Id.* Plaintiff followed up with Dr. Darby on January 26, 2011, and reported lower back pain. Tr. at 313. He requested that his medications be refilled. *Id.* Dr. Darby prescribed Lyrica and indicated Plaintiff needed a psychiatric consultation. Tr. at 314. Plaintiff again complained of lower back pain and requested prescription refills on April 4, 2011. Tr. at 315.

Also, on April 4, 2011, Dr. Darby wrote a letter to Plaintiff's attorney indicating that he was treating Plaintiff for hypertension, neuropathy, chronic pain, depression, and hyperlipidemia. Tr. at 333. He wrote "Mr. Kerr is on multiple medications and not able to work any occupation at this time." *Id.* He explained that Plaintiff underwent surgery to his cervical spine in 2001 and to his lumbar spine in 2007. *Id.* He stated Plaintiff was in constant pain and experienced depression and anxiety most of the time. *Id.* He indicated Plaintiff would be an occupational risk for any formal job and needed to see a neurologist and psychiatrist. *Id.*

On April 20, 2011, Plaintiff complained to Dr. Harris of pain in his left calf, foot, and great toe. Tr. at 301. Dr. Harris observed Plaintiff to have some swelling in his foot and some redness and warmth in his toes. *Id.* He assessed probable gout and prescribed Indocin and Medrol Dosepak. *Id.*

On May 2, 2011, Kenneth Martin, M.A., L.P.C. ("Mr. Martin"), of Richland Community Health Care Mental Health Services, wrote a letter indicating Plaintiff appeared to suffer from bipolar disorder, major depressive disorder, and a learning disability. Tr. at 307. He recommended Plaintiff receive a more extensive evaluation. *Id.*

On August 31, 2011, Darla Mullaney, M.D., a state agency physician, reviewed the medical evidence and found Plaintiff to be limited as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently climb ramps and stairs, balance, stoop, kneel, crouch, and

crawl; and occasionally climb ladders/ropes/scaffolds. Tr. at 87–88. Robert Kukla, M.D., assessed the same limitations on January 26, 2012. Tr. at 105–06.

On October 24, 2011, Plaintiff presented to Robert D. Phillips, Ph. D., for a mental status examination at the request of the agency. Tr. at 326–28. Plaintiff reported a history of learning disabilities and emotional problems. Tr. at 326. He reported daily activities that consisted of drinking coffee, sleeping, visiting his mother, cutting grass, watching television, and eating. Tr. at 327. He denied driving, but admitted doing household chores, preparing meals, shopping, managing his finances, and managing his personal care. *Id.* He reported a fair ability to work and was upset that no one would hire him, but also said that his slow learning and anger prevented him from working. *Id.* Dr. Philips considered Plaintiff open and friendly, but reduced in his intellectual functioning. *Id.* He was fairly well-oriented with limited communication skills, a very tense affect, reduced and limited thought processes, fairly good short term memory, good long term memory, good concentration, and cooperative behavior. *Id.* Dr. Philips considered Plaintiff's intellectual functioning reduced and estimated that he was functioning in the borderline range of intelligence. Tr. at 327–28. Dr. Philips conducted the Folstein Mini-Mental State Exam and Plaintiff received a total score of 22, which is in the normal range. Tr. at 327. Plaintiff was unable to complete serial sevens or spell "world" backwards. Tr. at 327. He was able to follow a simple direction, read and complete a simple written task, and write a simple sentence. Tr. at 328. He could not copy a simple geometric shape on paper. *Id.* Dr. Philips indicated Plaintiff did not appear to be malingering or embellishing his symptoms. *Id.* He noted Plaintiff's reported symptoms and abilities were consistent with

his observations during the evaluation. *Id.* He diagnosed borderline intellectual functioning (estimated), impulse control disorder, anxiety disorder, and depressive disorder with poor social skills and reduced coping skills. *Id.* However, he subsequently indicated Plaintiff's intellectual functioning was borderline "or lower." *Id.*

On November 23, 2011, Kevin King, Ph. D., a state agency psychologist, considered Listings 12.04 for affective disorders, 12.06 for anxiety-related disorders, and 12.08 for personality disorders. Tr. at 85. He concluded Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 86. Jeanne Wright, Ph. D., assessed the same level of restriction on January 26, 2012. Tr. at 102–04.

On February 2, 2012, Dr. Darby wrote a note indicating "Patient is Disabled." Tr. at 330.

Plaintiff presented to Kathleen M. Moser, APRN ("Ms. Moser"), on August 9, 2012, complaining of ringing in his left ear, neck pain, numbness in his fingers, disc pain, and gout in his left foot. Tr. at 398. Ms. Moser observed Plaintiff to have tenderness on palpation and muscle spasm. Tr. at 399. She also noted abnormalities on sensory exam. Tr. at 400. She described Plaintiff's mood as dysthymic, depressed, and frustrated. *Id.* She referred Plaintiff for an x-ray of his spine and indicated she would treat him for depression, pain, and muscle spasms. *Id.*

Plaintiff presented to Ms. Moser on September 12, 2012, for gout and fasting blood work. Tr. at 395. Plaintiff indicated his mood had improved and he was feeling less numbness, but he continued to complain of generalized osteoarthritis pain and shortness

of breath. *Id.* Ms. Moser noted abnormalities in Plaintiff's lumbosacral spine. Tr. at 396. She assessed exercise-induced bronchospasm, hyperlipidemia, obesity, arthrolithiasis, and chronic pain. Tr. at 397.

On November 8, 2012, Plaintiff indicated to Ms. Moser that he was unable to afford an x-ray of his spine. Tr. at 393. He also complained of psychiatric problems, including a long history of agoraphobia, anxiety, and isolation. *Id.* Ms. Moser noted Plaintiff had no job prospects and was very temperamental and easily angered if confronted or accused of not working as he should. *Id.* She indicated Plaintiff agreed to see a counselor, if needed. *Id.* Ms. Moser assessed obesity and chronic pain and instructed Plaintiff to consult with Augustus Rodgers, Ph. D. ("Dr. Rodgers"). Tr. at 394.

On November 12, 2012, Plaintiff presented to Robert Brabham, Ph. D. ("Dr. Brabham"), for a psychological and vocational evaluation. Tr. at 410–17. Plaintiff reported driving weekly, but with considerable pain and stress when in unfamiliar areas. Tr. at 410. His daily activities included basic personal grooming, with modifications to address his complaints of back pain; performing chores, including yard work, while taking frequent breaks; heating up meals cooked by his mother; shopping with family members to avoid crowds; reclining on the sofa for up to 6 hours a day while constantly changing positions; and napping one or two days per week. Tr. at 411. He reported depressive symptoms that included loss of interest or pleasure, social withdrawal, decreased sexual interest or desire, decreased energy, tiredness, fatigue out of proportion to activity, impaired concentration, distraction, and impaired memory. Tr. at 414. Dr. Brabham indicated Plaintiff appeared to cooperate and to give optimal effort during the

evaluation and that the results of testing were considered valid. Tr. at 415. Plaintiff

obtained a Full Scale IQ score of 67 on the Wechsler Adult Intelligence Scale–Fourth

Edition ("WAIS–IV"). *Id.* Dr. Brabham noted the following:

> The consistency of his scores and his report of years of intellectual and
> academic difficulties in school many years earlier and in his unsuccessful
> efforts to return to adult education are quite consistent with the finding that
> he indeed is functioning at a level defined as being Mild Mental
> Retardation.

*Id.* On the Wide Range Achievement Test–Revision 4 ("WRAT–R4"), Plaintiff scored

on a high first grade level in reading and on a high third grade level in arithmetic. *Id.* Dr.

Brabham diagnosed mild mental retardation, pain disorder, depressive disorder, not

otherwise specified ("NOS"), and generalized anxiety disorder. *Id.* He opined that

Plaintiff could not sustain gainful employment due to a combination of physical and

mental limitations. Tr. at 416–17.

Plaintiff visited Ms. Moser for medication refills on January 22, 2013, and March

19, 2013. Tr. at 390, 392.

Plaintiff presented to Dr. Rodgers on March 8, 2013, and reported having poor

health, chronic back and neck pain, being unable to work, and being totally dependent on

others. Tr. at 391. Dr. Rodgers described Plaintiff as casually-attired, neat, and well-

groomed with appropriate affect, good attitude, and pleasant mood, disposition, and

demeanor. *Id.* He indicated Plaintiff would participate in client-centered, ego supportive,

and self-emotive therapy geared toward helping him control his depression and anxiety.

Tr. at 392. On April 5, 2013, Plaintiff reported to Dr. Rodgers that he was nervous, but

9

that nothing had changed. Tr. at 389. Dr. Rodgers indicated Plaintiff demonstrated appropriate affect, good attitude, and a pleasant mood, demeanor, and disposition. *Id.*

On April 29, 2013, Kathrene C. Berger, DNP, APRN ("Ms. Berger"), evaluated Plaintiff for depression and anxiety at the request of Ms. Moser. Tr. at 404. Plaintiff indicated he experienced anxiety and did not like being around crowds. *Id.* He endorsed symptoms of depression related to his inability to work. *Id.* He indicated he had panic attacks, difficulty dealing with anger, and isolative tendencies. *Id.* He reported variable appetite, sporadic sleep, low energy, and feelings of worthlessness. *Id.* Ms. Berger assessed Plaintiff to have adjustment disorder with mixed emotional features; probable social phobia versus panic attack with agoraphobia; and mild mental retardation versus learning disability. Tr. at 406. She stated the following:

> Although Mr. Kerr endorses a longstanding history of depression and anxiety when he describes these in detail his symptoms are rather vague. His depression sounds more like boredom now that he doesn't have anything to occupy his time. He clearly has not adjusted to not being able to work. I discussed with him at length the possibility of going through voc rehab to learn a new vocation. He tells me he has met with him and that they have told him that they can't help him because he has such a limited education. He made it through the 11th grade but tells me he can barely read, can't spell or do math. He endorses being in special education classes all the way through school. It does sound like he may possibly have panic attacks, although he is unable to articulate this experience well. He endorses what sounds like more of a social phobia, particularly as it relates to new situations or crowds . . . .

*Id.*

C.    The Administrative Proceedings

    1.    The Administrative Hearing

        a.    Plaintiff's Testimony

At the hearing on September 12, 2013, Plaintiff testified he lived alone in a mobile home. Tr. at 45. He stated he was roughly six feet tall and weighed 298 pounds, which was an increase from 235 pounds five years earlier. *Id.* He testified he was right handed. *Id.* He confirmed that he had a driver's license and stated he drove once or twice per week. Tr. at 46. He indicated he took the driver's test on a computer on five or six occasions before he passed it. *Id.* He endorsed smoking one-and-a-half packs of cigarettes per day. Tr. at 47.

Plaintiff testified he was enrolled in special education classes when he was in school. Tr. at 54. He indicated he was unable to read or write a grocery list. *Id.* He stated he spent four years in shelters and foster homes from the ages of 13 to 18. *Id.* He stated he attended schools in Phoenix, Chicago, and Columbia. Tr. at 55. He denied having completed the forms in the record and stated his stepfather filled them out. *Id.* Plaintiff stated that he had difficulty in his last job because of reading, technology, and an inability to keep up with the material. Tr. at 56.

Plaintiff testified that he had worked for Owen Electric Steel as a crane operator and material handler. Tr. at 47. He stated he left the job because of a back injury. *Id.* He indicated he worked as a temporary employee for Carolina Personnel Services for approximately a year. *Id.* He indicated he worked for Bunzl Extrusion and Filtrona

Extrusion as a material handler. *Id.* He stated he collected unemployment after he stopped working. Tr. at 49.

Plaintiff testified he had a history of surgical procedures on his neck and lower back. Tr. at 51. He indicated he continued to experience back pain that he rated as an eight or nine of 10. *Id.* He stated his medication reduced his pain to a four or five of 10, but moving around, lifting, and twisting exacerbated it. Tr. at 52, 56. He testified he experienced pain, heat, and numbness that radiated from his back to the front of his thigh, knee, and calf. Tr. at 56. Plaintiff indicated his neck pain was exacerbated by picking up and carrying things. Tr. at 52. He testified that he experienced a burning sensation that ran from the left side of his neck into his shoulders. *Id.* He stated that he could lift five pounds without pain. *Id.* He indicated he had pain on his left side if he stood for long periods, which he clarified as no more than 30 minutes. *Id.* He stated he could sit for 10 to 15 minutes at a time. Tr. at 53.

Plaintiff testified he had been taking pain medication since his neck surgery in 2001. Tr. at 57. He indicated his physicians had recommended he see a doctor for pain management, but he was unable to afford pain management treatment. *Id.*

Plaintiff testified he experienced anxiety and depression and took two medications to treat his symptoms. Tr. at 57. He stated he was depressed because of his need to rely on others. Tr. at 57–58.

Plaintiff testified that the time he awoke varied from day-to-day. Tr. at 49. He indicated he lived four to five miles away from his parents, but next door to his sister. Tr. at 49, 58. He stated he occasionally used the microwave, cleaned, and mowed his yard

with a riding mower. Tr. at 50. He indicated his mother did his laundry at her house and that his mother, stepfather, or sister shopped for his groceries. *Id.* Plaintiff stated he visited his mother and stepfather twice a week. Tr. at 51.

> b.    Witness Testimony

Plaintiff's stepfather Harvey Driggers ("Mr. Driggers") testified at the hearing. Tr. at 59–69. He stated he had known Plaintiff for over 18 years. Tr. at 67. He indicated he had never seen Plaintiff read or write anything other than his signature. Tr. at 60. He stated that he had attempted to hand Plaintiff the sports section of the newspaper, but that Plaintiff had asked that he read the story to him. *Id.* Mr. Driggers indicated that he and his wife completed all of Plaintiff's paperwork and that Plaintiff brought them all of his mail to read. *Id.* He stated that he purchased the land that Plaintiff lived on and that he and his wife still paid for the property. *Id.*

Mr. Driggers testified his wife had left for six months during the previous year to care for her mother in Arkansas. Tr. at 61. Mr. Driggers indicated that, during that time, he was responsible for taking Plaintiff grocery shopping. *Id.* He stated Plaintiff was capable of picking up items and placing them in his shopping cart, but panicked and became sweaty and nervous if anything went wrong during the checkout process. *Id.* He indicated Plaintiff had difficulty being around crowds and refused to visit him if there were going to be more than three or four people in his house. *Id.* He testified Plaintiff did not respond well to questions he could not answer and often made something up or became angry and walked away. Tr. at 62. He indicated Plaintiff became belligerent and acted in a very child-like manner when he was corrected. Tr. at 62–63. He stated Plaintiff

had difficulty communicating complex thoughts. Tr. at 63. He indicated Plaintiff had difficulty making change, solving problems, and figuring out how to complete processes and operate machines. Tr. at 64–65. He stated Plaintiff was capable of performing basic activities of self-care, but that he required fairly constant supervision in performing other tasks. Tr. at 66. He indicated Plaintiff was capable of performing repetitive tasks after being trained, but that he did not always complete those tasks. *Id.*

The ALJ asked Mr. Driggers if Plaintiff had received specific mental health treatment. Tr. at 69. Mr. Driggers indicated his wife had contacted Lexington Mental Health, but had been unable to get Plaintiff in to see a provider there because he had no money and there was a long wait for an appointment. *Id.*

c.     Vocational Expert Testimony

Vocational Expert ("VE") Mary Cornelius ("Ms. Cornelius") reviewed the record and testified at the hearing. Tr. at 70. Ms. Cornelius categorized Plaintiff's PRW as a material handler, *Dictionary of Occupational Titles* ("*DOT*") number 929.687-030, which is heavy in exertional level with a specific vocational preparation ("SVP") of three and an overhead crane operator, *DOT* number 921.663-010, which is light with an SVP of five. Tr. at 71. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for about six hours in an eight-hour workday; occasionally climb ladders, ropes, and scaffolds; frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and was limited to unskilled work with occasionally interaction with the public. Tr. at 72. Ms. Cornelius testified that the hypothetical individual would be unable to

14

perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* Ms. Cornelius identified medium jobs with an SVP of two as a hand packer, *DOT* number 920.587-018, with 1,600 positions in South Carolina and 100,000 positions in the national economy and a laundry laborer, *DOT* number 361.687-018, with 800 positions in South Carolina and 60,000 positions in the national economy. Tr. at 72–73.

For a second hypothetical question, the ALJ asked Ms. Cornelius to assume an individual of Plaintiff's vocational profile and to further assume he was limited as follows: lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; frequently balance; occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; frequently lift overhead with the left upper extremity; limited to unskilled work with only occasional interaction with the public and no work requiring math or reading skills above the sixth grade level. Tr. at 73–74. Ms. Cornelius testified the individual would be unable to perform Plaintiff's PRW. Tr. at 74. The ALJ asked Ms. Cornelius to identify jobs an individual could perform with the specified restrictions. *Id.* Ms. Cornelius identified jobs at the light exertional level with an SVP of two as a plumbing assembler, *DOT* number 706.684-086, with 1,100 positions in South Carolina and 56,000 positions in the national economy and a garment folder, *DOT* number 789.687-066, with 3,000 positions in South Carolina and 200,000 positions in the national economy. *Id.*

For a third hypothetical question, the ALJ asked Ms. Cornelius to assume a hypothetical individual with Plaintiff's vocational profile who was limited as follows: lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; frequently balance and reach overhead with the left upper extremity; occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; limited to unskilled work with only occasional interaction; no team-type interaction with co-workers; and no work requiring reading or math skills over the sixth grade level. Tr. at 74–75. The ALJ asked if the individual would be able to perform any work available in the local or national economy. Tr. at 75. Ms. Cornelius indicated the individual could perform the same jobs identified in response to the second hypothetical question. *Id.*

For a fourth hypothetical, the ALJ asked Ms. Cornelius to assume a hypothetical individual with Plaintiff's vocational profile with the following limitations: lift and/or carry 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk for at least two hours in an eight-hour workday; sit for about six hours in an eight-hour workday; never climbing ladders, ropes, or scaffolds; frequently balancing and lifting overhead with the left upper extremity; occasionally climbing ramps/stairs, stooping, kneeling, crouching, and crawling; limited to unskilled work with only occasional interaction with the public and no team-type interaction with co-workers; and no work requiring math or reading skills above a fourth grade level. Tr. at 76. The ALJ asked Ms. Cornelius if the hypothetical individual would be able to perform any work available in the local or national economy. *Id.* Ms. Cornelius testified the individual could work at the

sedentary exertional level with an SVP of two as an address setter, *DOT* number 209.687-010, with 900 positions in South Carolina and 61,000 positions nationally, and a stem mounter, *DOT* number 725.684-018, with 1,200 positions in South Carolina and 58,000 positions nationally. *Id.*

For a fifth hypothetical question, the ALJ asked Ms. Cornelius to assume a hypothetical individual of Plaintiff's vocational profile who was limited as stated in Plaintiff's testimony, considering all testimony to be credible. Tr. at 77. The ALJ asked if an individual with such limitations would be able to perform Plaintiff's PRW. *Id.* Ms. Cornelius testified that an individual limited as indicated in Plaintiff's testimony would be precluded from performing all work. *Id.*

2.    The ALJ's Findings

In her decision dated November 22, 2013, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.
2.    The claimant has not engaged in substantial gainful activity since October 18, 2008, the alleged onset date (20 CFR 404.1571 *et. seq.*, and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: degenerative disc disease with a history of anterior cervical diskectomy and fusion, a history of lumbar diskectomy and fusion, left shoulder bursitis, obesity, borderline intellectual functioning, depressive disorder, anxiety disorder, and impulse control disorder (20 CFR 404.1520(c) and 416.920(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), with lifting and carrying 20 pounds occasionally and 10 pounds frequently; with standing and/or walking about

6 hours in an eight-hour workday; with sitting about 6 hours in an eight-hour workday; with no climbing of ladders, ropes, or scaffolds; with no more than frequent balancing; with no more than occasional climbing of stairs or ramps; with no more than occasional stooping, kneeling, crouching, and crawling; limited to frequent overhead reaching with the left upper extremity; with unlimited reaching in other directions with the left upper extremity; with no reaching limitations with the right upper extremity; limited to unskilled work; with occasional interaction with the public; with no work requiring reading or math skills above the sixth grade level; and with no team-type interaction with co-workers.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on December 13, 1965, and was 42 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 18, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 14–26.

II.  Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  the ALJ did not properly consider Listing 12.05C;

2)  the ALJ did not adequately evaluate the medical and non-medical opinions of record;

3)  the ALJ failed to give adequate reasons for rejecting the credibility of the lay witness;

18

4)   the ALJ did not provide sufficient reasons for concluding Plaintiff's statements were not entirely credible; and

5)   the ALJ did not appropriately assess Plaintiff's RFC.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.   Legal Framework

1.   The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed

impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the

---

impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court

must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Listing 12.05C

Plaintiff argues the ALJ erred in failing to properly consider whether his impairment met Listing 12.05C. [ECF No. 12 at 3]. He maintains the only IQ testing of record shows him to have a full-scale IQ score of 67, which was corroborated by the assessment of the state agency consultative examiner and not invalidated by the ALJ. *Id.* at 3, 6. He argues the IQ assessed by Dr. Brabham was representative of Plaintiff's lifelong IQ. *Id.* at 7–8. He contends the ALJ found he met the requirement for an additional impairment because she found him to have several severe impairments. *Id.* at 3–4.

The Commissioner argues that Plaintiff's impairment did not meet all of the criteria under Listing 12.05C. [ECF No. 13 at 9]. She maintains the ALJ accepted Dr. Phillips' diagnosis of borderline intellectual functioning as opposed to Dr. Brabham's diagnosis of mild mental retardation and its corresponding IQ score. *Id.* She also contends the ALJ concluded Plaintiff had failed to show adaptive deficits necessary to

meet Listing 12.05C. *Id.* at 9–10. She specifically points to Plaintiff's daily activities and history of semiskilled and skilled work. *Id.* at 10–11.

In reply, Plaintiff argues that deficits in adaptive functioning are not required to meet Listing 12.05C, but instead that the evidence must support onset of the impairment before age 22. [ECF No. 14 at 3]. He further maintains that an IQ score obtained later in life is presumed to relate back to childhood. *Id.* at 3–4. Plaintiff argues the ALJ reached two contradictory conclusions regarding his IQ because an IQ of 67 was not consistent with borderline intellectual functioning. *Id.* at 5. He maintains the ALJ did not cite sufficient evidence to support her conclusion that he lacked deficits in adaptive functioning and that the Commissioner is relying upon post hoc rationalization to support the ALJ's conclusion. *Id.* at 6–8.

In *Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012), the Fourth Circuit explained that a claimant must satisfy a three-pronged test to establish disability under Listing 12.05C. The first prong is derived from the introductory paragraph to Listing 12.05, which explains "intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R., Pt. 404, Subpt. P, App'x. 1, § 12.05; *see also Hancock*, 667 F.3d at 473. In *Hancock,* the court recognized that the first prong had two components—"deficits in adaptive functioning generally" and a "deficiency" that "manifested itself before the age of 22." 667 F.3d at 475 ("Either finding alone, if supported by substantial evidence, would be sufficient to support the conclusion that

Hancock did not satisfy Prong 1. Therefore, we must affirm the ALJ's decision if we find substantial evidence to support his findings with respect to either of the two components of Prong 1 of Listing 12.05C."). To satisfy the second and third prongs of Listing 12.05C, the claimant must have "'a valid verbal, performance, or full scale IQ of 60 through 70' ('Prong 2'), as well as 'a physical or other mental impairment imposing an additional and significant work-related limitation of function' ('Prong 3')." *Id.* at 473.

"Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012), citing *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002). In *Atkins*, the Supreme Court indicated intellectual disability was characterized by "significant limitations" in at least two of the areas of adaptive functioning in conjunction with significantly subaverage general intellectual functioning. *Atkins*, 536 U.S. at 309 n.3.

An absence of academic records does not preclude a finding that a claimant meets the first prong of Listing 12.05. *Cf. Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985) ("We must and do assume, therefore, that in the absence of any evidence of a change in plaintiff's intellectual functioning from the time of his back injury to the time of his IQ test, that he had the same or approximately the same IQ (63) at the time of his back injury on October 24, 1979 as he did at the time of his 1982 test."). In *Branham*, the court indicated "[t]he Secretary's regulations expressly define mental retardation as denoting 'a lifelong condition.'" 775 F.2d at 1274. The court explained "there may be

many reasons why an individual would not have had the opportunity or need to have a formal intelligence quotient test until later in life," but "[t]he fact that one was not earlier taken does not preclude a finding of earlier retardation." *Id.*

Nevertheless, "an ALJ has the discretion to assess the validity of an IQ test and is not required to accept it even if it is the only such result in the record." *Hancock*, 667 F.3d at 474. If an ALJ rejects an IQ assessment, she should cite sufficient evidence to support her decision. *Cf. id.* at 475, citing *Lowery v. Sulliva*n, 979 F.2d 835, 837 (11th Cir. 1992) ("A valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record of the claimant's daily activities and behavior.").

"Once it is established that the claimant's IQ falls within the range required by § 12.05C, the inquiry is whether the claimant suffers from any additional physical or mental impairment significantly limiting work-related functions." *Kennedy v. Heckler*, 739 F.2d 168, 172 (4th Cir. 1984).

The ALJ considered whether Plaintiff's impairment met Listing 12.05C, but concluded that "the evidence does not support the conclusion that the claimant has significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., before age 22." Tr. at 15. The ALJ further provided that Plaintiff had "borderline intellectual functioning with a Full-Scale IQ score of 67," but found the evidence failed "to show any significant adaptive deficits." *Id.* She supported her conclusion that Plaintiff lacked significant adaptive deficits by referencing his abilities to independently perform self-care; live

alone; hold a driver's license and operate a vehicle; maintain a long history of skilled and semi-skilled work; manage finances; use a microwave; and operate a riding lawn mower. *Id.* The ALJ acknowledged Plaintiff's allegation of a history of special education, but indicated the record did not contain school records showing Plaintiff to have been diagnosed with an intellectual disability or enrolled in special education classes. Tr. at 16. The ALJ later acknowledged that Dr. Brabham had diagnosed Plaintiff with mild mental retardation, but found "the claimant's long semi-skilled and skilled work history, and his high level of adaptive functioning, support the conclusion that the claimant has borderline intellectual functioning rather than mental retardation." Tr. at 22.

The court has considered Plaintiff's argument regarding the inconsistency of the ALJ's acceptance of the IQ of 67 and her rejection of Dr. Brabham's diagnosis of mild mental retardation. Upon cursory inspection, it appears that these two conclusions are in conflict. Mild mental retardation is characterized by an IQ level of 50–55 to approximately 70, and borderline intellectual functioning is characterized by slightly higher IQ scores in the 71–84 range. *Diagnostic & Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision, Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). However, *DSM-IV-TR* further explains that the differentiation between mild mental retardation and borderline intellectual functioning is more dependent upon adaptive functioning than numerical scores. *See id.* ("It should be noted that there is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument (e.g., a Wechsler IQ of 70 is considered to represent a range of 65–75). Thus, it is possible to diagnose Mental

Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning . . . . Impairments in adaptive functioning rather than a low IQ, are usually the presenting symptoms in individuals with Mental Retardation."). Because of the potential measurement error, Plaintiff's assessed IQ of 67 represented an actual IQ in the range of 62–72, which supported possible diagnoses of mild mental retardation and borderline intellectual functioning. Because the ALJ based her conclusion on the absence of deficits in adaptive functioning, the presenting symptom that distinguishes borderline intellectual functioning from mild mental retardation, the court finds no inconsistency between her acceptance of the IQ score of 67 and her determination that Plaintiff had borderline intellectual functioning. *See* Tr. at 22.

Thus, it appears the ALJ found Plaintiff met both the second and third prongs of Listing 12.05C, as explained in *Hancock*. She accepted the full-scale IQ of 67 assessed by Dr. Brabham, which satisfied the criterion for a valid verbal, performance, or full-scale IQ score between 60 and 70. Tr. at 15. She also assessed multiple severe impairments and limited Plaintiff to a reduced range of light work, which is consistent with recognition of additional physical and mental impairments that significantly limited Plaintiff's work-related functions. *See* Tr. at 14, 17.

Therefore, we examine whether the ALJ properly considered whether Plaintiff satisfied the requirements of the first prong of Listing 12.05C. As explained in *Hancock*, the first prong contains two components—(1) "deficits in adaptive functioning generally"

27

and (2) a "deficiency" that "manifested itself before the age of 22," and an ALJ's determination that the claimant failed to satisfy either is sufficient to support her conclusion, if such a conclusion is supported by substantial evidence. 667 F.3d at 475.

The court finds the ALJ's conclusion that Plaintiff did not have a deficiency that manifested itself before age 22 to be unsupported by substantial evidence. Plaintiff presented evidence to suggest he had deficiencies that manifested before age 22. Tr. at 47 (testified he had to take the driver's test five or six times to obtain a driver's license), 54 (testified he was enrolled in special education classes in school), 415 (testing revealed he read on a high first grade level and performed math on a high third grade level). The ALJ rejected this evidence merely because Plaintiff was unable to obtain school records to corroborate it. However, the Fourth Circuit's decision in *Branham* suggests that an ALJ may not rely on an absence of academic records to overcome the presumption that mental retardation is "a lifelong condition." *775* F.2d at 1274. Thus, the court finds the ALJ did not cite substantial evidence to support her conclusion that Plaintiff did not have deficiencies that manifested before age 22.

Thus, we consider whether the ALJ relied upon sufficient evidence to support her conclusion that Plaintiff lacked deficits in adaptive functioning. The ALJ concluded Plaintiff did not have deficits in adaptive functioning based on the fact that Plaintiff lived alone, independently performed self-care tasks, held a driver's license, drove a car, was able to manage finances, could use a lawn mower to cut grass, could prepare food using a microwave, and maintained a long history of skilled and semi-skilled work. Tr. at 67. Although Plaintiff presented significant evidence to suggest he had deficits in adaptive

functioning, this court is "not at liberty to 'reweigh conflicting evidence . . . or substitute our judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 476, citing *Johnson*, 434 F.3d at 653; *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996) ("We must sustain the ALJ's decision, even if we disagree with it, provided the determination is supported by substantial evidence."). In addition, this court "has repeatedly upheld an ALJ's finding that a claimant did not have deficits in adaptive functioning based in part on a past ability to perform semi-skilled or skilled work." *Weatherford v. Colvin*, No. 6:13-1885-RMG, 2014 WL 3881056, at *10 (D.S.C. Aug. 5, 2014), citing *Weedon v. Astrue*, No. 11-2971-DCN-PJG, 2013 WL 1315311, at *7 (D.S.C. Jan. 31, 2013), *adopted by* 2013 WL 1315206 (D.S.C. Mar. 28, 2013); *Jenkins v. Astrue*, No. 09-1653-JFA-PJG, 2010 WL 3168269, at *5 (D.S.C. Mar. 22, 2010); *see also Hancock*, 667 F.3d at 475–76 (concluding Plaintiff's history of semi-skilled work, among other factors, supported the ALJ's finding that the plaintiff did not manifest deficits in adaptive functioning prior to age 22).

If it were clear from the record that the ALJ weighed the conflicting evidence regarding Plaintiff's PRW and functional abilities, the undersigned would be constrained to find her conclusion that Plaintiff lacked deficits in adaptive functioning to be supported by substantial evidence. However, the record reveals an important unresolved conflict. Ms. Cornelius testified Plaintiff's PRW was semi-skilled and skilled and the ALJ accepted her opinion, which conflicted with that of Dr. Brabham, who classified Plaintiff's PRW as unskilled. *See* Tr. at 413. Dr. Brabham indicated Plaintiff's PRW included jobs as an assembly line worker, a general laborer, a dish washer, and a kitchen

worker, but Ms. Cornelius characterized Plaintiff's PRW as that of a material handler and an overhead crane operator. *Compare* Tr. at 412–13, with Tr. at 71. The record reveals that Dr. Brabham holds a master's degree in rehabilitation counseling, has maintained certification as a rehabilitation counselor, has published multiple relevant works, has taught vocational assessment-related courses at the higher education level, and has served as a vocational expert for the Social Security Administration ("SSA") over an extensive career. Tr. at 184–88. Ms. Cornelius also holds a master's degree in rehabilitation counseling, has worked in a variety of social service and rehabilitation settings, and has served as a vocational expert for the SSA for many years. Tr. at 193–94. Both Dr. Brabham and Ms. Cornelius were qualified to serve as vocational experts and both presumably reviewed the record, but they reached vastly different conclusions regarding Plaintiff's PRW. The ALJ relied heavily upon Ms. Cornelius' finding that Plaintiff had a history of semi-skilled and skilled work to support her finding that Plaintiff lacked deficits in adaptive functioning. *See* Tr. at 24 ("Particularly noteworthy is claimant's long work history as a material handler (SVP 3) and an overhead crane operator (SVP 5)."). However, she did not provide a reason for accepting Ms. Cornelius' conclusion regarding Plaintiff's PRW over Dr. Brabham's conclusion. In fact, she did not even acknowledge that a conflict existed between the two VEs' opinions. Because she placed significant emphasis on Plaintiff's PRW without resolving the conflicting evidence about the job titles and skill levels of that work, the undersigned cannot find that substantial evidence supported her conclusion that Plaintiff lacked deficits in adaptive functioning.

2.     Opinion Evidence

ALJs must consider all medical opinions in the record. 20 C.F.R. §§ 404.1527(b),

416.927(b). Medical opinions are "statements from physicians and psychologists or other

acceptable medical sources that reflect judgments about the nature and severity of your

impairment(s), including your symptoms, diagnosis and prognosis, what you can still do

despite impairment(s), and your physical or mental restrictions." SSR 96-5p, quoting 20

C.F.R. §§ 404.1527(a) and 416.927(a). Acceptable medical sources include licensed

physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists,

and qualified speech-language pathologists. SSR 06-p; 20 C.F.R. §§ 404.1513(a),

416.913(a). "Other sources" include medical and psychological providers, such as nurse

practitioners physician assistants, licensed clinical social workers, naturopaths,

chiropractors, audiologists, and therapists, as well as non-medical sources, such as

educational personnel, social welfare agency personnel, rehabilitation counselors,

spouses, other relatives, friends, neighbors, clergy, and former co-workers and

employers. 20 C.F.R. § 404.1513(d), 416.913(d).

If an ALJ declines to convey controlling weight to a treating physician's opinion

or if the record does not contain a treating physician's opinion, the ALJ should consider

"all of the following factors" to determine the weight to be accorded to every medical

opinion in the record: whether an examining relationship exists between the claimant and

the medical source; whether a treatment relationship exists, and, if it does, the length of

the treatment relationship and frequency of examination and the nature and extent of the

treatment relationship; the support for the opinion in the medical source's examination or

treatment records or opinion statement; the consistency of the opinion with the record as a whole; the specialization of the medical source; and other factors. 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also Johnson*, 434 F.3d at 654. This court has held that "an express discussion of each factor is not required as long as the ALJ demonstrates that he applied the . . . factors and provides good reasons for his decision." *Hendrix v. Astrue*, C/A No. 1:09-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010). It is not the role of this court to disturb the ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

Because medical opinions may only be rendered by acceptable medical sources, ALJs are not required to explicitly weigh the opinions of other sources based on the criteria set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). SSR 06-3p. Nevertheless, because the factors set forth in 20 C.F.R. § 404.1527(c) and 416.927(c) represent basic principles for the consideration of all opinions evidence, they should guide ALJs in considering opinions provided by individuals who do not qualify as acceptable medical sources. *Id.*

a.    Dr. Brabham's Opinion

Plaintiff argues the ALJ erred in weighing Dr. Brabham's opinion and in finding him to not be an acceptable medical source. [ECF No. 12 at 10]. He maintains the ALJ

also impermissibly discounted Dr. Brabham's opinion because it was obtained at the expense of his attorney for the purpose of litigation. *Id.* at 11–12.

The ALJ discussed Dr. Brabham's report, but gave his conclusions "little to no weight." Tr. at 22. She "emphasized that the claimant underwent this examination not in an attempt to seek treatment for symptoms, but rather, through attorney referral and in connection with an effort to generate evidence for the current appeal" and noted "Dr. Brabham was presumably paid for the report." Tr. at 21–22. She found that while "such evidence is certainly legitimate and deserves due consideration, the context in which it was produced cannot be entirely ignored." Tr. at 22. She found that Dr. Brabham's "employability evaluation included an evaluation of medical records, which is outside of Dr. Brabham's area of expertise" as a psychologist as opposed to a medical doctor. *Id.* She stated Dr. Brabham was "not an acceptable medical source for assessing physical impairments. *Id.*, citing 20 C.F.R. §§ 404.1513 and 416.913 (1999). She indicated Dr. Brabham's opinion regarding Plaintiff's employability was a finding reserved to the Commissioner and, thus, carried no special significance. *Id.* Finally, the ALJ concluded that Plaintiff's "long semi-skilled and skilled work history, and his high level of adaptive functioning, support the conclusion that the claimant has borderline intellectual functioning rather than mental retardation." *Id.*

The court finds the ALJ improperly discounted Dr. Brabham's opinion based on the fact that it was solicited in connection with Plaintiff's claim for benefits. It was unjust to penalize Plaintiff for providing evidence in an effort to meet his legal burden to prove his disability. *See Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981) ("A claimant for

disability benefits bears the burden of proving a disability"), citing 42 U.S.C. § 423(d)(5); 20 C.F.R. § 404.1502 (1980); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). In addition, "the regulations provide that the claimant may present evidence to rebut the ALJ's findings of fact with respect to vocational factors and residual functional capacity." *Id.* at 265, citing 20 C.F.R., Part 404, Subpart P, App'x. 2, § 200.00(a). The SSA referred Plaintiff for an examination with Dr. Phillips, who opined that he had borderline or lower intellectual functioning, but Dr. Phillips did not test Plaintiff's IQ. Tr. at 328. Furthermore, the record suggests there were ambiguities regarding the nature of Plaintiff's PRW, but that the SSA reviewers had generally classified Plaintiff's PRW as semi-skilled and skilled. *See* Tr. at 84, 92, 109. Dr. Brabham's report supplements the record by providing an assessment of Plaintiff's IQ and explaining the ambiguities regarding Plaintiff's PRW. By undergoing evaluation by Dr. Brabham and submitting the report, Plaintiff was merely attempting to meet his evidentiary burden and to rebut the vocational evidence in the record.

As a psychologist, Dr. Brabham was an acceptable medical source with respect to issues related to Plaintiff's psychological functioning. *See* SSR 06-p; 20 C.F.R. §§ 404.1513(a), 416.913(a). In his role as a rehabilitative counselor, Dr. Brabham served as an "other source." *See* 20 C.F.R. § 404.1513(d), 416.913(d). Thus, the ALJ was required to weigh the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c) with respect to the psychological aspect of Dr. Brabham's opinion, but should have been also been guided by those factors in weighing the vocational aspect of his opinion. *See* SSR 06-3p.

It is not clear from her decision that the ALJ weighed the relevant factors in assessing the psychological portion of Dr. Brabham's opinion. The ALJ leaned heavily on what she perceived as an inconsistency between the record as a whole and Dr. Brabham's opinion, but, in doing so, she did not reconcile the support for Dr. Brabhman's findings in his own report and the record as a whole. The ALJ rejected Dr. Brabham's diagnosis of mild mental retardation without considering its consistency with Dr. Phillips' indication that Plaintiff may have lower than borderline intellectual functioning. *Compare* Tr. at 24, *with* Tr. at 328. She also relied upon Plaintiff's history of semi-skilled and skilled work to refute Dr. Brabham's diagnosis of mild mental retardation, but she did so without resolving the conflict in the evidence as to whether Plaintiff actually performed semi-skilled and skilled work. Tr. at 22. The ALJ did not consider the support for Dr. Brabham's opinion in the testing he performed. *See* Tr. at 415. She seemingly rejected the WRAT–4 scores obtained by Dr. Brabham based on her assessment that Plaintiff could read and perform math on a sixth grade level, but she provided no explanation for rejecting the scores or for the reading and mathematical abilities she assessed. *Compare* Tr. at 17, *with* Tr. at 415. While the ALJ was not required to explicitly discuss all of the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c), the undersigned cannot find her explanation that Dr. Brabham's opinion was inconsistent with the record as a whole to reflect adequate consideration of the supportability and consistency factors or to be supported by substantial evidence.

Furthermore, it is not evident from a review of the ALJ's decision that she adequately considered the vocational aspect of Dr. Brabham's opinion. Although the ALJ

was correct in her assessment that the issue of disability is reserved to the Commissioner, the fact that Dr. Brabham provided an opinion on Plaintiff's ability to work did not negate every other aspect of his vocational opinion. *See* Tr. at 22; 20 C.F.R. §§ 404.1527(d), 416.927(d). While the ALJ was correct that Dr. Brabham's review of medical records was outside his area of expertise as a psychologist, the ALJ failed to contemplate that Dr. Brabham considered Plaintiff's medical records and history not in his capacity as a psychologist, but in his capacity as a rehabilitation counselor and vocational expert. *See* Tr. at 22, 416–17. Dr. Brabham's opinion regarding Plaintiff's PRW was certainly rendered in his capacity as a VE. *See* Tr. at 412–13. He discussed the evidence gleaned from his interview and testing, as well as a review of the medical history that was pertinent to Plaintiff's work-related restrictions. *See* Tr. at 416–17. He then assessed work-related restrictions based upon that evidence. *See id.* The ALJ neglected to consider the evidence and underlying rationale and, therefore, did not adequately weigh the vocational aspect of Dr. Brabham's opinion.

b.     Dr. Phillips' Report

Plaintiff argues the ALJ erred in failing to assess the weight of Dr. Phillips' report. [ECF No. 12 at 12–13].

The ALJ indicated the following with respect to Dr. Phillips' opinion: "[t]he results from this consultative examination support the residual functional capacity found in this decision." *See* Tr. at 20. However, the ALJ subsequently stated that Dr. Phillips' suggestion that Plaintiff had reduced and limited thought processes was inconsistent with Plaintiff's normal performance on the Folstein Mini-Mental State Exam ("MMSE"). *See*

*id.* In addition, while the ALJ acknowledged Dr. Phillips' finding that Plaintiff's estimated IQ was in the borderline or lower range, she later rejected the notion that Plaintiff's intellectual functioning was below the borderline range. *Compare* Tr. at 20, *with* Tr. at 22.

Thus, it appears that the ALJ accepted Dr. Phillips' opinion to the extent that it was consistent with a finding that Plaintiff functioned in the borderline range of intelligence, but rejected his findings that were contrary to that conclusion. Aside from pointing to the results of the Folstein MMSE as being inconsistent with an assessment of reduced and limited thought processes, the ALJ failed to give good reasons for rejecting Dr. Phillips' other findings. *See* Tr. at 327–28 (unable to perform serial sevens, unable to spell "world" backwards, unable to repeat a compound sentence, unable to copy a simple geometric shape, reduced mental awareness, likely to need help handling funds). Therefore, the court finds the ALJ did not adequately consider Dr. Phillips' opinion.

c.      Ms. Moser's Opinion

On January 16, 2014, Plaintiff submitted a physician's statement to the Appeals Council from Ms. Moser dated January 14, 2015. Tr. at 7. The Appeals Council incorporated this evidence into the record. Tr. at 5. Ms. Moser indicated Plaintiff's disability was permanent; that Plaintiff was unable to work or to participate in activities to prepare for work; that Plaintiff could sit, stand, walk, climb stairs/ladders, kneel/squat, bend/stoop, push/pull, use a keyboard, lift/carry, and perform other activities for a maximum of two hours per workday; that Plaintiff could perform no lifting; and that Plaintiff was unable to work in more than 30-minute intervals. Tr. at 421. Ms. Moser

indicated Plaintiff's primary disabling diagnosis to be lower back pain and his secondary disabling diagnosis to be left shoulder pain. Tr. at 422. She also commented that Plaintiff had a painful left hand and neck pain. *Id.*

Plaintiff argues the Appeals Council erred in failing to evaluate Ms. Moser's opinion. [ECF No. 12 at 13]. Although the undersigned acknowledges that Ms. Moser was not an acceptable medical source per 20 C.F.R. §§ 404.1513(a) and 416.913(a), the record shows Ms. Moser was one of Plaintiff's primary treating sources and the only treating source to address Plaintiff's specific functional limitations. Ms. Moser also observed multiple abnormalities on examination. *See* Tr. at 396, 399–400. Because of her unique role and the support for her opinion in her record, the ALJ should evaluate her opinion on remand.

### d.    Dr. Darby's Opinion

Plaintiff argues the ALJ erred in rejecting Dr. Darby's opinions merely because he was not a medical doctor. [ECF No. 12 at 24]. The Commissioner maintains the ALJ gave Dr. Darby's opinions little to no weight because she found they were not supported by the medical record as a whole. [ECF No. 13 at 14].

The ALJ indicated she considered Dr. Darby's statements, but gave them little to no weight. Tr. at 19. The ALJ pointed out that Plaintiff testified he stopped working because of his back problems, and did not indicate he considered himself to be an occupational risk. *Id.* She indicated Plaintiff had a long work history, despite his intellectual functioning. *Id.* She specified that a doctor at Lexington Family Practice assessed only slight work-related limitation due to depression and that no other physician

had imposed restrictions during office visits. Tr. at 20. She indicated Plaintiff had a history of conservative treatment, without emergency room visits or hospitalizations. *Id.* She also pointed to what she characterized as Plaintiff's "fairly active and varied lifestyle." *Id.*

The record suggests that the ALJ did not adequately consider Dr. Darby's opinion. As a physician's assistant, Dr. Darby was not an acceptable medical source whose opinion had to be explicitly weighed based on the factors in 20 C.F.R. § 404.1527(c) and 416.927(c). However, because Dr. Darby was Plaintiff's primary medical provider during a portion of the relevant period, the ALJ should have considered the treatment relationship and supportability of his opinion. While the ALJ generally referred to perceived inconsistencies between Dr. Darby's opinion and the record as a whole, she did not appear to consider Dr. Darby's progress notes, which generally supported his opinion regarding the effects of Plaintiff's pain. *See* Tr. at 312, 313, 315. She also neglected to consider the consistency of Dr. Darby's opinion with the abnormal findings Ms. Moser noted, with Dr. Phillips' and Dr. Brabham's findings, and with Plaintiff's history of cervical and lumbar diskectomy. *See* Tr. at 328, 352, 356, 396, 399–400, 416. In light of these errors, the court finds the ALJ did not adequately consider Dr. Darby's opinion.

3.    Lay Witness Testimony

Plaintiff argues the ALJ erred in rejecting Mr. Driggers' testimony based on their familial relationship. [ECF No. 12 at 13]. He maintains the ALJ found Mr. Driggers' testimony to be "partially credible," but failed to specify which parts of the testimony she found credible and which parts she found incredible. *Id.* at 13–14. He contends his

familial relationship with Mr. Driggers was not a basis for rejecting his testimony under SSR 06-03p. [ECF No. 14 at 10].

The Commissioner argues the ALJ permissibly considered the witness' familial relationship with Plaintiff as a factor that affected his credibility. [ECF No. 13 at 11]. She maintains the ALJ further discounted the witness' testimony because it "was of questionable accuracy and inconsistent with the rest of the evidence in the record." *Id.* at 11.

"[T]he ALJ must consider the relevant medical evidence and other evidence of the claimant's condition in the record, including testimony from the claimant and family members." *Morgan v. Barnhart*, 142 F. App'x 716, 720 (4th Cir. 2005), citing 20 C.F.R. § 404.1529(c)(3). If a lay witness provides information in addition to the claimant's testimony, the ALJ is required to weigh the lay testimony and articulate reasons for rejecting or accepting it. *Id.* "In considering evidence from 'non-medical sources' who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors, it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR 06-3p.

In *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975), the court stated that it was the Commissioner's "prerogative to assess the credibility of witnesses." *See also Hays*, 907 F.2d at 1456. The court subsequently provided that "such determinations will

not be discounted except under extraordinary circumstances." *Parker v. Bowen*, 838 F.2d

467 (Table), 1988 WL 6817, at *1 (4th Cir. 1988).

> The ALJ wrote the following regarding Mr. Driggers' testimony:
>
> Harvey Driggers, the claimant's stepfather for 18 years, testified that he has never seen the claimant write anything but his signature and says the claimant cannot read. He also testified that the claimant is easily angered and frustrated. However, Mr. Driggers also testified that the claimant has been employed by temporary agencies, taught to do simple, repetitive tasks and hired on permanently by some of the companies he was previously assigned to as a temporary employee. Further, the record does not indicate that the claimant has ever been in any trouble with the law or has ever injured anyone out of anger. Moreover, although Mr. Driggers may have never seen the claimant write anything, the claimant's previous work history and his ability to attain a driver's license by taking the test on a computer indicates a level of ability that does not exceed the residual functional capacity in this decision. Finally, while I have considered the testimony of the claimant's stepfather, and while I find it partially credible, it does not establish that the claimant is disabled. Since the claimant's stepfather is not medically trained to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms, or the frequency or intensity of unusual moods or mannerisms, the accuracy of the information provided is questionable. Moreover, by virtue of his relationship with the claimant, he cannot be considered a disinterested third-party witness whose statements would not be colored by affection for the claimant. Most importantly, significant weight cannot be given to these statements because they are simply not consistent with the rest of the record.

Tr. at 23.

The ALJ considered and weighed Mr. Driggers' testimony based on the criteria set

forth in SSR 06-3p and found it partially credible, but stated it did not establish that

Plaintiff was disabled. The ALJ considered the fact that Dr. Driggers had known Plaintiff

for 18 years and was his stepfather, but found some of his testimony to be inconsistent

with the other evidence. *See* Tr. at 23.

Although Plaintiff argues that it is not clear which evidence the ALJ found credible, a review of her explanation reveals that she did not find credible Mr. Driggers' testimony that Plaintiff was unable to read and write. *See id.* It also reveals that she found Mr. Driggers' testimony that Plaintiff was easily angered and frustrated to be inconsistent with his work history and his lack of a criminal record. *See id.*

In light of the deference accorded to the factfinder's assessment of witness testimony, this court would generally be constrained to find that the ALJ adequately considered Mr. Driggers' testimony. However, because the ALJ rejected parts of Mr. Driggers' opinion based upon a flawed assessment of Plaintiff's PRW and a failure to consider parts of Dr. Brabham's testing pertaining to Plaintiff's abilities to read and write, the court finds the ALJ did not adequately consider Mr. Driggers' testimony.

### 4.     Credibility

Plaintiff argues the ALJ did not consider his symptoms in accordance with the provisions of SSR 96-7p. [ECF No. 12 at 17–18]. He maintains the ALJ's conclusion that his symptoms were eliminated by medications was not supported by the record or by the opinions of the state agency consultants. *Id.* at 18. He contends that after having satisfied his obligation to provide evidence of a condition reasonably likely to cause his alleged symptoms, he was entitled to rely on his symptoms alone to prove the severity of his impairment. *Id.* at 21. Plaintiff also argues that the ALJ cited no sufficient inconsistencies in the record regarding his intellectual functioning. [ECF No. 14 at 11].

The Commissioner argues the ALJ cited legally sufficient reasons for finding Plaintiff's statements to be not entirely credible. [ECF No. 13 at 11–12]. She maintains

the ALJ referred to multiple inconsistencies in the record that undermined the credibility of Plaintiff's statements. *Id.* at 12. She contends there was no discrepancy between the state agency consultant's opinion and the ALJ's assessment of Plaintiff's credibility. *Id.*

A finding of disability cannot be based on allegations of pain or other symptoms without medical signs and laboratory findings demonstrating the existence of a medically-determinable impairment that would cause such pain and symptoms. SSR 96-7p. An ALJ should only consider the intensity, persistence, and functionally-limiting effects of symptoms after the claimant has established the existence of a medically-determinable impairment. *Id.* Once a claimant has established the existence of a condition reasonably likely to cause the alleged symptoms, he may "rely exclusively on subjective evidence to prove the second part of the test." *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006). "[T]he adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record" in determining whether the claimant's statements are credible. SSR 96-7p. To assess the credibility of the claimant's statements, the ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* The ALJ cannot disregard the claimant's statements about symptoms merely because they are not substantiated by objective medical evidence. *Id.* Furthermore, the ALJ must specify his reasons for the finding on credibility, and his reasons must be supported by the evidence in the case record. *Id.* The

ALJ's decision must clearly indicate the weight accorded to the claimant's statements and the reasons for that weight. *Id.* Although this court must defer to the ALJ's findings of fact, the court is not required to "credit even those findings contradicted by undisputed evidence." *Hines*, 453 F.3d at 566, citing *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) ("An ALJ may not select and discuss only that evidence that favors his ultimate conclusion . . . .").

To assess the credibility of a claimant's statements, the ALJ must consider the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes per hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restriction due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The ALJ found Plaintiff to be unpersuasive in describing his impairments. Tr. at 24. She indicated the record did not support Plaintiff's claim that he was illiterate. *Id.* She found Plaintiff to be "very successful in adaptive functioning." *Id.* She pointed to Plaintiff's long work history. *Id.* She cited an indication in his medical record that he used marijuana. *Id.* She pointed out that the medical evidence showed no "significant

strength deficits, circulatory compromise, neurological deficits, muscle spasms, fasciculations, fibrillations, or muscle atrophy that are often associated with long standing, severe or intense pain, and physical inactivity." Tr. at 23. She stated mental exams had "not shown any significant clinical findings such as lapses in attention or memory." Tr. at 23–24. She noted Plaintiff's treatment had been conservative and limited to routine office visits and prescription medications and that medications had generally eliminated all of Plaintiff's symptoms. Tr. at 24.

Contrary to Plaintiff's assertion, the ALJ did not rely exclusively on a lack of objective evidence to undermine his credibility. She cited a lack of objective evidence, but also pointed to Plaintiff's daily activities, work history, treatment history, and indications of illegal drug use. *See* Tr. at 24.

Nevertheless, the ALJ impermissibly ignored evidence that did not support her assessment of Plaintiff's credibility. *See Hines*, 453 F.3d at 566. As discussed above, she failed to resolve a conflict regarding the descriptions and skill levels of Plaintiff's PRW, did not adequately consider relevant psychological testing and medical and vocational opinion evidence, and did not properly assess the credibility of the lay witness. She did not discuss Plaintiff's indications that his daily activities were limited by pain or his testimony that he required help with tasks such as grocery shopping, doing laundry, and preparing meals. *See* Tr. at 49–50, 51–53, 56–57. She did not consider Plaintiff's description of the location, duration, frequency, and intensity of his pain. *See* Tr. at 51, 52, 53, 56. She failed to consider the side effects of Plaintiff's medications, which Dr. Darby indicated to be significant. *See* Tr. at 333. She concluded Plaintiff's pain was

eliminated by use of medications, but ignored medical reports to the contrary. *See* Tr. at 301, 313, 315, 391, 394, 395, 398–400, 410. Because the ALJ did not resolve conflicts in the evidence or adequately consider the relevant factors in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), her credibility finding was not supported by substantial evidence.

5.    RFC Assessment

Plaintiff argues the ALJ assessed his RFC without analyzing his symptoms or explaining her reasons for her conclusion in accordance with SSR 96-8p. [ECF No. 12 at 22]. He maintains the ALJ assessed his RFC before assessing his credibility. *Id.* at 23. He also contends the ALJ neglected to discuss the frequency with which Plaintiff performed activities of daily living. [ECF No. 14 at 13].

The Commissioner argues the ALJ followed the controlling regulations in evaluating Plaintiff's subjective complaints and assessing his RFC. [ECF No. 13 at 13].

To assess a claimant's RFC, the ALJ must identify the limitations imposed by the claimant's impairments and assess his work-related abilities on a function-by-function basis. SSR 96-8p. "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* Relevant evidence includes medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms that are reasonably attributed to the medically-determinable impairment, evidence from attempts to work, need for structured living environment, and work evaluations. *Id.* The Fourth

Circuit recently held that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

Because the court has found the ALJ failed to resolve conflicts in the record, adequately consider opinion evidence and testimony, and properly assess Plaintiff's credibility, the undersigned is unable to find the RFC she assessed to be supported by substantial evidence. Therefore, it is appropriate for the ALJ to reassess Plaintiff's RFC after thoroughly considering all of the relevant evidence.

III.     Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

September 11, 2015                                 Shiva V. Hodges
Columbia, South Carolina                          United States Magistrate Judge